# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| GREGORY A. MOSBY, | ) |
| Plaintiff, | ) |
| v. | ) Case No. CIV-00472-RAW |
| THE KANSAS CITY SOUTHERN RAILWAY COMPANY, a corporation, | ) COMPLAINT AND JURY DEMAND |
| Defendant. | ) |

Serve: The Corporation Company
1833 S. Morgan Road
Oklahoma City, OK 73128

## NATURE OF ACTION

1. Plaintiff Gregory Mosby respectfully submits this complaint against the Defendant pursuant to the protection provisions of the Federal Rail Safety Act, 49 U.S.C. § 20109 ("§ 20109").

## JURISDICTION

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 49 U.S.C. § 20109.

## VENUE

3. Venue is proper pursuant to 28 U.S.C. § 1391 because the adverse actions occurred here and the Defendant does business here.

1

## PARTIES

4. Plaintiff Mosby ("Mosby") is currently a resident of Alabama, but at the time of the events in question was an Oklahoma resident and was employed by the Defendant. Mosby is a member of the class for which protective legislation was enacted, and was personally and adversely affected by the actions of the Defendant.

5. Defendant Kansas City Southern Railway Company ("KCS"), is a railroad carrier engaged in interstate commerce and doing business in the state of Oklahoma. KCS employed Mosby at the time of the incidents complained of herein.

## STATEMENT OF OPERATIVE FACTS

6. In brief, Mosby alleges that KCS delayed and interfered with his medical treatment, brought two separate disciplinary charges against him, issued him harsher discipline than other employees, pulled him out of service, and ultimately terminated his employment, in retaliation for reporting a work-related personal injury.

7. Mosby had been employed by KCS since he was hired as a Brakeman on February 23, 1998. On May 25, 1998 Mosby became a conductor, the position he held until he was discharged on May 9, 2010. He was a member of the United Transportation Union ("UTU") during the course of his career with KCS.

8. On or about April 16, 2010 the KCS assigned Mr. Mosby to perform switching work in the KCS' switching yard in Watts, Oklahoma. He was assigned to perform this work with Engineer Roy McGee and Brakeman Lyndal Stewart.

9. The work at Watts required Mosby and his crew to build a train that was going to be taken south out of Watts to Marble City, Oklahoma. In order to build the train the crew had

to identify the cars in Watts yard that were supposed to be put into the train and then put them in the correct positions into the train.

10. This work required Mosby as the conductor to identify the cars that needed to be picked up. The engineer operated the locomotive engine that moved the cars where they needed to be. The brakeman performed the couplings, meaning that he worked in radio communication with the engineer to give him information he needed to move the cars into position, to bring the couplers between the cars together, and to lace up the air hoses and do the other things necessary to hold the cars together as a train.

11. Under the KCS' rules, the brakeman's duties in performing the couplings included watching the "point of the shove". A shove is a move in which the engine pushes or more cars. The point of the shove is the farthest end of the car farthest from the engine. It is the first part of the cars being shoved that would strike anything that might be in the way of the shove.

12. The brakeman is required to watch the point of the shove in order to make sure that the area into which the cars are being shoved is clear of people, equipment and anything that might be struck by the cars being shoved. If the brakeman were to see anything that might be struck by the shove, he is required to radio the engineer to stop the shove before anyone or anything might be struck.

13. Under the KCS' rules, the brakeman's duties also included making sure that when the coupling is made, the area into which the cars being coupled into will be pushed under the force of the impact is clear of anyone or anything that they might strike.

14. One of the couplings the brakeman had to make the evening of April 16, 2010 required him to direct the engineer to shove a number of cars southward toward two cars that the brakeman was going to couple into the train.

15. At the time that the brakeman began this move, Mr. Mosby was standing a few feet south of the south end of the cars that the brakeman was going to have the train couple into. He was facing south with the list of cars the crew was supposed to put into the train, looking for the next cars from the list to be put into the train.

16. While Mr. Mosby was facing south looking for the next cars the crew needed to put into the train, the brakeman directed the engineer to shove a number of cars into the cars that were behind Mr. Mosby. The brakeman did not watch the point of the shove, and he did not do anything to make sure the area into which the cars would be pushed upon impact was clear.

17. When the cars behind Mr. Mosby were struck by the shove, the impact was so great that it shoved those cars into him. A low grab iron on the corner of the car closest to Mr. Mosby hit him in the middle of the right side of his back in the area of his ribs.

18. Mr. Mosby was accustomed to heavy manual labor. He began working in steel plants when he was in his 20's. He ran heavy machinery in the Air Force, and he had been a railroader since he was 31. When he was hit, it felt to him as though the wind was knocked out of him. He was able to move around and do some stretches, and he thought he was alright. Mr. Mosby worked out the rest of his shift.

19. The day of the incident was a Friday.

20. On Saturday Mr. Mosby felt worse, and his condition did not improve on Sunday.

21. When he was not better by Monday, Mr. Mosby decided that he wanted to have a health care provider examine him. He went to a chiropractor in Gentry, Arkansas who helped

him with a carpal tunnel condition. When he explained to the chiropractor the history of the pain he was having in his back, the chiropractor told him that because it was work related Mr. Mosby would have to call his employer to get permission for the treatment. Mr. Mosby then called the KCS and requested permission for the medical treatment.

22. When Mr. Mosby contacted the KCS to request permission for the medical treatment, he spoke with Assistant Trainmaster (ATM) Kerry Douglas.

23. The ATM then conferred with the Senior Trainmaster (STM) Antonio McKinney. The STM had the ATM go to the health care provider's facility where Mr. Mosby was, take him a personal injury report, and then have Mr. Mosby call him.

24. The ATM met Mr. Mosby at the health care provider facility and had Mr. Mosby call the STM. Mr. Mosby told the STM what happened and why he was requesting the medical care.

25. The STM and ATM allowed Mr. Mosby to fill out a personal injury report but did not allow him the medical care he requested. They denied Mr. Mosby the medical treatment he requested.

26. Instead of allowing him the medical care he requested, the STM and ATM told Mr. Mosby that he would have to be seen by a medical doctor arranged by the KCS.

27. The STM and ATM required Mr. Mosby to go to an occupational medicine clinic in Fort Smith, Arkansas. There no one knew what they were to do with Mr. Mosby. After consulting with the KCS' Kansas City, Missouri office the people at the occupational medicine clinic sent Mr. Mosby to another occupational medicine clinic at another address.

28. At the second occupational medicine clinic the KCS sent him to, Mr. Mosby had to wait a considerable amount of time before he finally was seen by a health care provider.

29. Eventually, Mr. Mosby was diagnosed as having a broken rib and a bruised kidney.

30. When the KCS denied Mr. Mosby the medical treatment he requested, and then interfered in and delayed his medical treatment by requiring him to go to the medical doctor the KCS arranged for him, the KCS violated the prohibition of 49 U.S.C. § 20109 (c) (1).

31. The KCS called a formal investigation to determine the cause and responsibility for the incident in which Mr. Mosby was injured.

32. The result of the formal investigation was that Mr. Mosby, the engineer, and the brakeman each were given the same discipline. Each was punished with 30 days off work, 5 considered to have been already served.

33. The KCS called a separate formal investigation against Mr. Mosby alone. This separate formal investigation was called against Mr. Mosby because he filled out a personal injury report for the injuries he suffered in the April 16, 2010 incident.

34. The charge the KCS brought against Mr. Mosby was "late reporting of an injury"..

35. Rule 1.1.3 instructs employees, "(r)eport by the first means of communication any...personal injuries..."

36. Rule 1.2.5 instructs employees, "(a)ll cases of personal injury, while on duty or on company property, must be immediately reported..."

37. Nowhere in the KCS' rules is the term "personal injuries" or the term "cases of personal injury" defined or explained. It is left to the employee, without any instruction, guide, or standard to determine for himself if he has suffered a "personal injur(y)" or whether his is a "cases of personal injury" within the meaning of these rules.

38. At the formal investigation the STM, the ATM, and Mr. Mosby all testified that Mr. Mosby did not fill out a personal injury report at the time he was struck by the shove because he did not believe he was injured. He thought he just had the wind knocked out of him. The STM testified "when I asked Mr. Mosby about the delayed reporting, he indicated that he thought he was going to be okay...", "...that he thought he may have been okay Friday...yes". The ATM testified "I asked him how — why he had not reported it on Friday when the incident occurred and he informed me that he just — he thought the wind was knocked out of him. He thought he would be okay". Mosby testified "(b)ecause at the — as I didn't feel the injury at the time of the incident, I didn't feel it was that bad. I thought I just knocked the wind out of me and I just didn't think there was — I don't like to be a candy-butt about them kind of things. I'm not one that does that kind of thing and I didn't want to (indiscernible). In all honesty, if I didn't have to make a big deal out of it, I didn't want to because not only is — I just — I didn't want to make an issue out of it if an issue didn't need to be made, and I honestly did not feel that I was hurt that bad, just thought it knocked the wind out of me".

39. No evidence was presented at the formal investigation contradicting this testimony of the STM, the ATM, and Mr. Mosby.

40. In good faith Mr. Mosby exercised the discretion the KCS gives its employees to determine whether they are sufficiently injured to fill out a personal injury report. There was no valid reason to terminate him for the exercise of that discretion.

## CAUSE OF ACTION UNDER 49 U.S.C. § 20109

The only reasons for the KCS to terminate Mr. Mosby were:

    i. To retaliate against him for making his injury known by:

        1. Filling out a personal injury report.

7

2. Seeking medical attention.

ii. To send a message to other employees that if they filled out personal injury reports and / or sought medical attention for their injuries, they would be putting their jobs in jeopardy also.

38. The termination communicated to Mr. Mosby in the KCS' May 9, 2010 letter to him constituted discrimination in the form of discharge within the meaning of 49 U.S.C. § (a), and it constituted termination within the meaning of the term discipline under 49 U.S.C. § (c) (2).

39. After Mosby was terminated he struggled to find employment within the railroad community due to the effect of the termination on his personnel record. After two years of searching and great financial loss, Mosby was able to find a position with a non-union, short-line railroad in Alabama. This employment also required Mosby to incur the expenses of having to sell his house and many possessions in order to move from Oklahoma to Alabama to earn wages and benefits far less than he was earning with KCS.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

39. On November 5, 2010, Mosby filed a complaint under § 20109 with the United States Department of Labor and the Occupational Safety and Health Administration (OSHA). Mosby's Complaint was filed within 180 days of adverse action of KCS and was deemed timely.

40. OSHA commenced its investigation and Mosby fully cooperated with the investigation.

41. On November 22, 2013 the Secretary of Labor, acting through his agent, the Acting Regional Administrator for OSHA, Region VII, issued the Findings and Preliminary Order arising out of Mosby's complaint.

42. On December 17, 2013 KCS filed a Notice of Objection and Request for Hearing with the Department of Labor, Office of Administrative Law Judges.

43. On January 23, 2014 the Office of Administrative Law Judges docketed the matter. On March 5, 2014 the hearing was set to commence on October 7, 2014. On September 23, 2014 an Order was issued canceling the hearing without indication of a new hearing date.

44. On September 24, 2014, Mosby filed a Notice of Intention to File Original Action in United States District Court under the provision of 49 U.S.C. § 20109(d)(3).

45. The Secretary of Labor has not issued a final decision within 210 days after the filing of the § 20109 Complaint. The delay is not due to any bad faith on the part of Mosby.

46. Pursuant to 49 U.S.C. § 20109(d)(3), Mosby is now bringing this original action at law and equity for *de novo* review by the United States District Court, which Court has jurisdiction over this action without regard to the amount in controversy.

47. Mosby hereby requests a judgment under 49 U.S.C. § 20109 for all relief appropriate under the circumstances, including but not limited to:

> A. Back wages from the time of Mosby's firing until his hiring at his new position;
> B. An amount per week equal to the difference between the wages and benefits Mosby is now earning as compared to what he was earning at KCS for the time period of Mosby's hiring at his new position through his estimated retirement;
> C. KCS shall file with the Railroad Retirement Board all forms necessary to ensure that Mosby is properly credited for the months of service that he would have earned absent KCS adverse action;
> D. Compensatory damages including compensation for any special damages;
> E. Litigation costs including expert witness fees and reasonable attorney fees;
> F. Punitive damages.

Plaintiff respectfully requests trial hereof by jury.

FITE LAW FIRM

*(signature)*

BART FITE, OK Bar No. 10809
P. O. Box 1411
Muskogee, OK 74402
Telephone:   918-683-0309
Facsimile:   918-686-7510
E-mail:           bfitelaw@gmail.com

and

Christopher H. Leach, MO Bar# 34147
HUBBELL LAW FIRM, L.L.C.
1100 Main Street, Suite 2930
Kansas City, MO 64105
Telephone:   816.221.5666
Facsimile:   816.221.5259
E-Mail:           cleach@hubbellfirm.com

Attorneys for Plaintiff